UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA

                                                                      **Hon. Hugh B. Scott**
                                                                          00CR0189

                              v.                                          **Report**
                                                                            **&**
                                                                      **Recommendation**

JAMES CHARLES KOPP,

                              Defendant.

Before the Court is the omnibus motion filed on behalf of the defendant.  The defendant

seeks the following relief: (1) discovery and notice under Rules 12 and 16 of the Federal Rules of

Criminal Procedure;[1] (2) dismissal of the indictment on grounds of double jeopardy; (3) change

of venue; (4) dismissal on the grounds that the Freedom of Access to Clinic Entrance Act

("FACE") is unconstitutional; (5) suppression of statements made to the media; (6) suppression

of expert testimony; (7) a  hearing regarding identification procedures; and (8) suppression of

electronic eavesdrop warrants.[2] (Docket No. 125).

---

[1]The defendant's discovery requests are the subject of a separate Decision & Order.

[2]At the time John F. Humann, Esq. was appointed as counsel for the defendant in this matter, numerous motions remained unresolved. The motions pending at that time, included Docket Nos. 15, 16, 17 (all filed by William Clauss prior to his appointment as counsel in this matter); No. 24 (filed by John Broderick, Esq. although it does not appear that Mr. Broderick ever officially represented the defendant in this matter); No. 33 (filed by Paul Cambria, Esq., defendant's initial counsel in this case); as well as Nos. 82 and 85 filed by Clauss after replacing Cambria.   In addition, the defendant had filed a *pro se* motion, Docket No. 85 and submitted unfiled documents dated September 18, 2003 and November 20, 2003 seeking various relief.  On January 23, 2004, the defendant and counsel advised the Court that all of the pending motions were withdrawn. This withdrawal was stated and accepted in open court. On January 26, 2004, the Court was advised that the defendant had determined that he reconsidered and no longer wished to withdraw his pending motions.  On January 27, 2004, the Court directed that counsel for the defendant review the various motions and file *one omnibus filing* stating all the various forms of relief the defendant

## Background

The defendant, James Charles Kopp ("Kopp"), is named in a two-count indictment. In Count I, Kopp is charged with a violation of 18 U.S.C. §248(a)(1) and (b)[3] for the death of Dr. Barnett Slepian. Count II asserts that Kopp violated 18 U.S.C. §924(c)[4] and (j)[5] by allegedly using a firearm to commit a crime of violence, the shooting of Dr. Slepian.

---

continues to seek. The Court noted that any request for relief contained in any previously filed motion or pleading, which is not included in the omnibus filing, shall be deemed moot or abandoned by the defendant. The Court also noted that while the defendant remains represented by counsel in this case the Court would not entertain motions filed by the defendant *pro se*.

[3]  28 U.S.C. §248(a)(1) provides: "Whoever ... (1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services; ... shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c), except that a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed exclusively at that minor."

28 U.S.C. §248(b) provides: "Whoever violates this section shall ... (1) in the case of a first offense, be fined in accordance with this title, or imprisoned not more than one year, or both; ... except that if bodily injury results, the length of imprisonment shall be not more than 10 years, and if death results, it shall be for any term of years or for life."

[4]  The various subsections of 18 U.S.C. §924(c) provide, in relevant part, as follows: §924(c)(1)(A) provides that "[e]xcept to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence ... for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime– (i) be sentenced to a term of imprisonment of not less than 5 years; (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years."

18 U.S.C. §924(c)(1)(B) states that "[i]f the firearm possessed by a person convicted of a violation of this subsection– (i) is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, the person shall be sentenced to a term of imprisonment of not less than 10 years; or (ii) is a machine gun or a destructive device, or is equipped with a firearm silencer or firearm muffler, the person shall be sentenced to a term of imprisonment of not less than 30 years."

18 U.S.C. §924(c)(3) provides that "[f]or purposes of this subsection the term "crime of violence" means an offense that is a felony and– (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

[5]  18 U.S.C.924(j) provides that a "person who steals any firearm which is moving as, or is a part of, or which has moved in, interstate or foreign commerce shall be imprisoned for not more than 10 years, fined under this title, or both."

In a related, but separate prosecution, a Grand Jury in the Western District of New York had charged Dennis Malvasi and Loretta Marra in a six-count indictment alleging, among other things, that the couple obstructed justice in the investigation of Kopp, harbored and concealed Kopp, and aided and abetted him in his attempt to evade capture. See Second Superseding Indictment dated May 23, 2002 in United States v. Marra et al. (W.D.N.Y. Case No. 01CR060A). At some time after May 23, 2002, Marra, Malvasi and the government agreed to the terms of a plea agreement in which the most serious charges against Marra and Malasi would be dismissed. On August 21, 2002, the District Court rejected the plea agreement as an attempt to circumvent the federal sentencing guidelines and directed the parties to prepare for trial. The government then moved to dismiss the entire six-count Second Superseding Indictment against Marra and Malvasi in this district, while at the same time the government filed a criminal complaint in the United States District Court for the Eastern District of New York charging Marra and Malvasi only with the lesser crime of conspiring to harbor and conceal Kopp. On October 17, 2002, the criminal charges pending in the Western District of New York against Marra and Malvasi were dismissed upon the request of the government. Marra and Malvasi eventually pled guilty to certain charges in the Eastern District of New York.

In addition to the instant federal filed charges against him, Kopp was also charged, and ultimately convicted, in the New York State Supreme Court for Erie County with numerous offenses, including murder, arising out of the killing of Dr. Slepian. Kopp was represented by Bruce Barket Esq. in those State Court proceedings. On November 20, 2002, a local newspaper reported that Kopp confessed to killing Dr. Slepian during an interview with reporters on November 12, 2002. The newspaper reported that Kopp expressly acknowledged that he had used the rifle as claimed by the government, that he in fact shot at Dr. Slepian and intended to

injure him and that he did so because of Dr. Slepian's association with providing medical services at an abortion clinic.   According to the news report, the confession was part of a trial strategy inasmuch as Barket was present with Kopp when he made the statements.

## Discussion

**Double Jeopardy**

Kopp seeks dismissal of the indictment on the grounds of double jeopardy.  He argues that the federal government should not be allowed to prosecute him for a violation of the FACE Act because he has already been convicted by New York State of second degree murder for the death of Dr. Slepian.

It is well settled that there is no general constitutional bar to duplicative prosecutions in state and federal court. Koon v. United States, 518 U.S. 81, 112 (1996).  Double jeopardy does not bar successive prosecutions brought by separate sovereigns (Heathv. Alabama, 474 U.S. 82, 88-89(1985); United States v. Lara, --- U.S. ----, 124 S.Ct. 1628 (2004), unless the second prosecuting authority served as a "tool" of, or "cover" for, the first.  Bartkus v. Illinois, 359 U.S. 121, 123-24(1959); see also United States v. Arena, 180 F.3d 380, 399 (2d Cir.1999) (noting inapplicability of dual sovereignty principle "if one of the sovereigns effectively controlled the other, and the subsequent prosecution was merely a sham, masking a second prosecution by the sovereign that pursued the first prosecution").  Although the record reflects some communication between the state and federal agents in this case, there is nothing to suggest that the federal prosecution is a sham or tool for the New York State or the State's interest.

The defendant initially points to the "Petite Policy," named for Petite v. United States, 361 U.S. 529 (1960) wherein the Court recognized a Department of Justice policy of declining to

prosecute certain cases following a state court prosecution based upon the same acts.  Kopp acknowledges, however, that the invocation of the Petite Policy rests entirely within the discretion of the government. (Docket No. 125 at ¶ 35).  Because the government has chosen to prosecute the instant charges against the defendant, the Petite Policy does not govern in this case.

Notwithstanding the fact that both the Supreme Court and the Second Circuit continue to affirm the validity of the dual sovereignty doctrine, Kopp also asks the Court to reexamine the doctrine based upon the facts of this case.  He argues that his conviction of second degree murder in the New York State Court was not an "inadequate" result; that pursuant to that conviction he will spend at least 25 years in jail; and that his continued prosecution in federal court would be a waste of resources.  The Court is not persuaded that Kopp has articulated any basis warranting a departure from the dual sovereignty doctrine in this case.  The Court notes that although the federal and state charges both emanated from Kopp's actions in killing Dr. Slepian, the FACE Act charges are different in nature and scope and include different elements than the second degree murder charges of which Kopp was convicted in the state court.  Although Kopp's state court conviction may be an adequate result relating to the second degree murder charges, the Court notes that Kopp has appealed that conviction.  Neither the defendant nor the government, of course, are in a position to guarantee that Kopp's state court conviction will withstand appeal.  Even if that were the case, Kopp's conviction in state court does not address the substantial interest of the federal government in enforcing its federal penal statutes, such as the FACE Act.

Based on the above, it is recommended that the defendant's motion to dismiss the indictment based upon double jeopardy grounds be denied.

**Venue**

Kopp  also seeks a change of venue based upon both his state court conviction and pretrial publicity generated in this case.

The Fifth and Sixth Amendments to the United States Constitution guarantee a defendant a fair trial by a panel of impartial jurors.  Rule 21(a) of the Federal Rules of Criminal Procedure provides that a transfer of venue is warranted "if the Court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."  Traditional factors for assessing the risk of presumed prejudice include but are not limited to, the extent to which the government is responsible for generating the publicity, the extent to which the publicity focuses on the crime rather than on the individual defendant charged with it, and other factors reflecting on the likely effect of the publicity on the ability of potential jurors in the district to hear the evidence impartially. *See* United States v. Maldonado-Rivera, 922 F.2d 934, 967 (2d Cir.1990); United States  v. Salim, 189 F.Supp.2d 93, 95 (S.D.N.Y.,2002). To succeed on a motion to change venue, the defendant must show a "reasonable likelihood" that prejudicial news prior to trial will prevent a fair trial. Maldonado-Rivera, 922 F.2d. at 966-67.

Where a motion for a change of venue is made before jury selection, the Court cannot conduct a searching *voir dire* to determine whether any actual prejudice against the defendant exists.  Thus, the Court must determine whether inherent prejudice exists precluding Kopp from receiving a fair trial in the Western District of New York.  The defendant points to his state court conviction and pretrial publicity in this case.   The fact that Kopp has stood trial and has been convicted of second degree murder in Western New York does not necessitate a finding that he cannot obtain a fair trial with respect to the FACE Act charges against him in federal court. As

discussed above, although the charges arise from the same set of facts, the state and federal

charges against Kopp are not identical.  Initially, the Court notes that it is fairly common for a

defendant convicted of one crime to be subsequently prosecuted for another crime in the same

jurisdiction. Moreover, in light of the fact that more than a year has passed since Kopp's state

court conviction (and it is likely that more than 2 years will have passed before jury selection is

commenced in this case), his previous conviction, even though related, does not establish an

inherent prejudice that would prevent Kopp from obtaining a fair trial in the Western District of

New York.  This passage of time would significantly dissipate any alleged prejudice resulting

from Kopp's state court conviction.  See  United States v. Yousef, 327 F.3d. 56, 155 (2d. Cir.

2003).

It is undisputed that this case has resulted in more media coverage than the typical crime

in Western New York.  The defendant points generally to this media coverage and argues that it

is "implausible that a jury could be empaneled that was ignorant of Mr. Kopp, the charges against

him or the hundreds of news reports generated about the case." (Docket No. 125 at ¶ 56).

Specifically, Kopp points to two items of categories of pretrial publicity: (1) the more than two

hundred news articles in the Buffalo News naming Kopp in connection with Dr. Slepian's

murder and (2) the fact that Special Agent John P. Culhane, Jr. of the Federal Bureau of

Investigation ("FBI"), speaking at a disaster-preparedness seminar, likened Kopp to Osama bin

Laden. (Docket No. 125 at ¶ 60).

It is well settled that substantial publicity alone is not enough to require a change in

venue. United States v. Salim, 151 F.Supp. 2d 281, 2283 (S.D.N.Y.  2001).   Jurors need not be

totally ignorant of the facts and issues of the underlying charges to provide a defendant with a

fair trial. United States v. Stevens, 83 F.3d. 60, 65 (2d. Cir. 1995) cert. denied 519 U.S. 902

(1996); see also Murphy v. Florida, 421 U.S. 794, 799 (1975)(juror exposure to information

about a state defendant's prior convictions or to news accounts of the crime with which he is

charged alone does not presumptively deprive the defendant of due process).

 News accounts regarding Kopp's possible involvement in Dr. Slepian's killing date back

six years to the 1998 event. Although the defendant asserts that some of the news accounts were

inflammatory, he has not identified any particular news item as such (with the exception of the

report of the statement by Agent Culhane).   The Court notes that not all of the news articles and

media coverage here have been negative toward the defendant in this case.  Some articles, such

as one dated November 6, 1998, titled "A plea to surrender: Man sought in Slepian probe called

non-violent," portray Kopp in a somewhat positive light suggesting that he is "intensely religious

and opposed to violence."  (Docket No. 129 at Exhibit VII-2).   Moreover, in weighing the

defendant's change of venue motion, the Court must consider the fact that some of the pretrial

publicity in this case has been generated by the defendant himself.  Stevens, 83 F.3d. at 66 (Court

held that much of the pretrial publicity was generated by the defendant inasmuch as he made

persistent efforts to hold jailhouse interviews); Maldonado-Rivera, 922 F.2d. at 934 (defendants

found to have generated some of the pretrial publicity); Murphy, 421 U.S. at 796 (many of the

articles related to statements made by defendant or his attorney).   A review of the news articles

contained in the record reflects that a significant amount of the media attention in this case is

attributable to the defendant's conduct by granting interviews to local reporters wherein Kopp

confessed to his involvement in Dr. Slepian's death. The record reflects that Kopp, or his

counsel, have also spoken to the media on various occasions about his pretrial prison conditions.

(Docket No. 129, Exhibit III-1).  In any event, notwithstanding the defendant's bare conclusions,

the Court cannot conclude, based upon this record, that the volume of news coverage in this case

would preclude Kopp from obtaining a fair trial in the Western District of New York.

The addition of the statements by Agent Culhane also does not alter the Court's

conclusion. The record does not reflect the number of persons present at the time of Agent

Culhane's statement, nor the extent of the media coverage regarding the statement.  In any event,

it appears that more than three years has passed since Agent Culhane made this statement.  The

passage of such a significant amount of time would dissipate any prejudice to the defendant.  It

has not been established that the *voir dire* process could not be used to find jurors who are not

aware of or influenced by Agent Culhane's statement.

At this stage of the proceedings, the defendant has not established, and the record does

not reflect,  a presumption of inherent prejudice which would preclude Kopp from obtaining a

fair trial in this District.  Thus, it is recommended that the motion to change venue be denied at

this time.


**Constitutionality of the FACE Act**

The defendant argues that the FACE Act is unconstitutional in that it allegedly makes a

federal crime of intrastate activities, rather than interstate activities which may be federally

regulated under the Commerce Clause.

This is not the first court to entertain a motion challenging the constitutionality of the

FACE Act.  In United States v. Weslin, 156 F.3d. 292, 295 (2d. Cir. 1998) cert. denied 523 U.S.

1071 (1998),  the Second Circuit expressly held that the FACE Act "is a valid exercise of

Congress' power under the Commerce Clause."  Every Circuit Court of Appeals that has

addressed the issue has come to the same conclusion.  See Norton v. Ashcroft, 298 F.3d. 547,

556 (3d. Cir.2002), *cert. denied*, 537 U.S. 1172 (2003); United States v. Gregg, 226 F.3d. 253,

262-63 (3d. Cir. 2000); <u>Hoffman v. Hunt</u>, 126 F.3d. 575, 582-88 (4th Cir. 1997); <u>United States v. Bird</u>, 124 F.3d. 667, 672-82 (5th Cir. 1997)("Bird I"); <u>Terry v. Reno</u>, 101 F.3d. 1412, 1415-18 (D.C.Cir. 1997); <u>United States v. Sorderna</u>, 82 F.3d. 1370, 1372-74 (7th Cir. 1996); <u>United States v. Dinwiddie</u>, 76 F.3d. 913, 920 (8th Cir. 1996); <u>Cheffer v. Reno</u>, 55 F.3d. 1517, 1519-21 (11th Cir. 1995).

The defendant argues that the Court should disregard <u>Weslin</u> in light of the Supreme Court's ruling in <u>United States v. Morrision</u>, 529 U.S. 598 (2000). <u>Morrison</u> did not involve the FACE Act, but rather it struck down certain provisions of the Violence Against Women Act of 1994 ("VAWA").  <u>Morrison</u> is not relevant to the instant case except insofar as it provides further guidance of how to determine whether a law regulates activity that has a substantial effect on interstate commerce. In <u>United States v. Lopez</u>, 514 U.S. 549, 558-59 (1995), the Supreme Court identified three broad categories of activity that Congress may regulate under its commerce power: (1) the regulation of the use of the channels of interstate commerce; (2) the "regulation and protection of the instrumentalities of interstate commerce, or persons or things in interstate commerce even though the threat may come only from intrastate activity," and (3) the regulation of  activities having a substantial relation to interstate commerce ... <i>i.e.,</i> those activities that substantially affect interstate commerce." <u>Lopez</u>, 514 at  558-559.   With respect to this last category, the Court in <u>Morrison</u> articulated four factors to be considered: (1) the economic nature of the regulated activity; (2) a jurisdictional element limiting the reach of the law to a discrete set of activities that additionally has an explicit connection with or effect on interstate commerce; (3) express congressional findings regarding the effects upon interstate commerce of the activity in question; and (4) the link between the regulated activity and interstate commerce. <u>Morrison</u>, 529

U.S. at 611-612.[6]

Stating only that <u>Weslin</u> predated <u>Morrison</u>, the defendant does not articulate how the reasoning of <u>Weslin</u> is invalidated by the application of the factors relating to interstate commerce identified in <u>Morrison</u>.  In any event, the Third Circuit in <u>Gregg</u>, which expressly applied <u>Morrison</u>, concluded similarly to <u>Weslin</u> that the FACE Act was a proper exercise of Congress' commerce clause power.

The Court in <u>Gregg</u> set out the Congressional findings that established that the conduct proscribed by the FACE Act effected interstate commerce.  Initially, the Court found that:

> The legislative record establishes that a shortage of abortion-related services exists in this country that is exacerbated by the misconduct proscribed by FACE. *See* S.Rep. No. 103-117, at 17. Only 17 percent of counties in the United States have an abortion provider. *See* H.R.Rep. No. 103-306, at 8, U.S.C.C.A.N., at 705. This leaves 83 percent of counties without a physician willing to perform abortions. *See* S.Rep. No. 103-117, at 17 & n. 29. The shortage is most severe in rural counties because reproductive health clinics are located primarily in metropolitan areas, leaving women residing in rural areas without a provider of these services. *See* H.R.Rep. No. 103-306, at 8, U.S.C.C.A.N., at 705. In a rural community, only one provider usually exists in a large geographical area, thus making it a preferred target for anti-abortionists because elimination of that provider eliminates abortion services for all women in that area. *See* H.R.Rep. No. 103-306, at 8, U.S.C.C.A.N., at 705.

<u>Gregg</u>, 226 F.3d. at 263-264.

The Court found that as a result of these activities a national market for abortion services exists creating a substantial effect on interstate commerce:

> The shortage of abortion-related services has resulted in a national

---

[6]     Applying these considerations, the Court in Morrison determined that the civil remedy provision of VAWA, in part, because gender-motivated crimes "are not in any sense of the phrase, economic activity." <u>Morrison</u>, 529 U.S. at 613.

market for these services because many of the patients must engage in interstate commerce by traveling from one state to obtain reproductive health services in another. Testimony and evidence before Congress showed that substantial numbers of women travel interstate to seek the services of reproductive health clinics. *See* S.Rep. No. 103-117, at 31; H.R.Rep. No. 103-603, at 6, U.S.C.C.A.N., at 703. Many patients travel over 100 miles to their appointments. *See* S.Rep. No. 103-117, at 17 & n. 29. For one example, Ms. Sylvia Doe, who testified before Congress that after learning her baby suffered from a permanent disability that would cause its early death, traveled from Virginia to a clinic in Kansas capable of performing the procedure she required. *See* H.R.Rep. No. 103-306, at 7-8, U.S.C.C.A.N., at 704-05. Furthermore, the Senate found that 44 percent of the patients treated at a clinic in Wichita, KS, are from out of state. *See* S.Rep. No. 103-117, at 31. Congress's determination that reproductive health services are an interstate market was well supported by the testimony presented to the committees.

Gregg, 226 F.3d. at 264 citing Bird I, 124 F.3d at 668-79 (setting forth a summary of testimony).

In addition, the Third Circuit noted that Congress determined that the conduct proscribed by the FACE Act effected interstate commerce in other ways as well:

In addition, reproductive health clinics employ a national market of physicians and staff. Because of the shortage of physicians willing to perform abortions in the age of clinic violence, doctors employed at reproductive health clinics often travel across state lines to provide abortion services. *See* S.Rep. No. 103-117, at 31 & n. 46. "Some doctors traveled to several states, some for hundreds of miles, to perform abortions at clinics which had no physicians of their own." *Id.* For example, in South Dakota the only physician who performs abortions commutes from Minnesota and provides abortion services in Minnesota, Montana, North Dakota, and parts of Canada. *See id.* at 16-17 & n. 29, 31. The Senate Committee also concluded that reproductive health clinics engage in interstate commerce. The Committee reported that Clinics and other abortion service providers clearly are involved in interstate commerce, both directly and indirectly. They purchase medicine, medical supplies, surgical instruments and other necessary medical products, often from other States; they employ staff; they own and lease office space; they generate income. In short, the Committee finds that they operate within the

12

stream of interstate commerce. S.Rep. No. 103-117, at 31.

Thus, Congress found that a national market existed for reproductive health services because of the shortage of physicians who provide abortion-related services, that reproductive health clinics often employ physicians from outside the state in which they are located, and reproductive health clinics themselves are engaged in interstate commerce. Finally, Congress determined that the conduct prohibited by FACE inhibits and prohibits the delivery of reproductive health care services in the national market. Based on the testimony and evidence before it, Congress found that the clinic blockades, the threats against employees, and the other violent and obstructive activities prohibited by FACE have the single goal of eliminating the practice of abortion by closing abortion clinics. *See* S.Rep. No. 103- 117, at 11; H.R.Rep. No. 103-306, at 6, U.S.C.C.A.N., at 703. Congress also, based on the evidence before it, rationally determined that the national movement was succeeding. The House Report stated that the "campaign of violence has led to death, injury, harassment, fear, and thousands of arrests all across the nation. It has resulted, as intended, in access to the constitutionally protected right to choose being denied to thousands of women nationwide against their will." H.R.Rep. No. 103-306, at 6, U.S.C.C.A.N., at 703. The Senate Report states that clinic blockades and violent protests proscribed by the Act have "a significant adverse impact not only on abortion patients and providers, but also on the delivery of a wide range of health care services." S.Rep. No. 103-117, at 14. The effect of the violence forced "clinics to close, caused serious and harmful delays in the provision of medical services, and increased health risks to patients." *Id*.

Furthermore, when FACE was enacted, millions of dollars of damage had been caused to these facilities by the clinic blockades. *See* H.R.Rep. No. 103- 306, at 7, U.S.C.C.A.N., at 704. The damage caused to reproductive health care facilities eliminates on a temporary or permanent basis the reproductive health care services that are provided by the facilities. *See id.* at 9, U.S.C.C.A.N., at 706. Thus, the activities proscribed by FACE inhibit the operation of entities that are directly engaged in interstate commerce.

Gregg, 226 F.3d. at 265.

Congress also found a direct link between the abortion-related violence and the shortage

of physicians willing to perform abortions.  The Third Circuit summarized this evidence as

follows:

> Congress explicitly noted the link between the abortion-related violence and the shortage of physicians willing to perform abortions. A number of physicians and health care personnel have been intimidated by the threats of violence made to them and their families and have stopped providing their services, thus contributing to the shortage of providers. The House Committee found that rural clinics and doctors have become the preferred targets for abortion foes because elimination of that single provider effectively eliminates service for many women. *See* H.R.Rep. No. 103-306, at 8, U.S.C.C.A.N., at 705. The Senate Committee also reported that the violence "has ... taken a severe toll on providers, intimidated some into ceasing to offer abortion services, and contributed to an already acute shortage of qualified abortion providers." S.Rep. No. 103-117, at 14. Specifically, "some providers have succumbed to the intimidation and threats." *Id*. at 17. At least three physicians in Dallas stopped performing abortions in 1992 as a result of pressure by an anti-abortion group, two doctors stopped working in 1993 after receiving death threats, and since Dr. Gunn, an abortion-provider in Florida, was shot in 1993, at least eight more doctors have stopped offering abortion services. *See id*. at 16-17. The House Committee also reported that the shortage of abortion providers is "at least partially attributable to the violence and intimidation described in this report. Doctors understandably are leaving the field, and new graduate[s] have little desire to enter the field even as part of a wider obstetrics/gynecology practice." H.R.Rep. No. 103-306, at 8, U.S.C.C.A.N., at 705.

Gregg, 266 F.3d. at 265.

In addition, Congress may properly consider whether intrastate activity, when aggregated, has an effect on interstate commerce.  Congress did so with respect to the FACE Act:

> Moreover, although under Lopez Congress may regulate intrastate activity that in the aggregate has an effect on interstate commerce, the anti-abortion movement itself whose conduct is regulated by FACE is national in scope. Congress found that many of the activities were organized and directed across state lines. *See* S.Rep. No. 103-117, at 13, 14 & n. 26; H.R.Rep. No. 103-306, at 9, U.S.C.C.A.N., at 706. The House reported that a national strategy has emerged, orchestrated by anti-abortion leaders. *See*

> H.R.Rep. No. 103-306, at 9, U.S.C.C.A.N., at 706. Congress found
> that the conduct regulated by FACE was beyond the control of
> local and state authorities. Thus, when it enacted FACE, Congress
> sought to regulate a truly national problem.

Gregg, 226 F.3d. at 265-266.

In sum, Congress determined that due to the acute shortage of abortion-related services in this country a national market for abortion-related services exists. Congress also found that the conduct proscribed by the FACE Act--the commission of blockades and other acts of violence--has a substantial effect on the availability in interstate commerce of reproductive health services. The effect of the misconduct was also determined to deter physicians from providing further services and temporarily and permanently to shut down reproductive health clinics, thus forcing large numbers of women to travel across state lines to obtain services. The United States Senate found that the shift of demand for abortion services from those areas where clinic access is obstructed to those areas where it is not accessible represents the sort of interstate commerce effect that is beyond the effective control of any one state and is accordingly a proper subject for congressional regulation under the Commerce Clause. Bird I, 124 F.3d at 681 (quoting Senate Hearings, at 97 (statement of Professor Tribe)).

The Court in Gregg distinguished the Morrison Court's findings relating to the VAWA from the FACE Act, stating:

> In contrast to gender-motivated crime, the activity regulated by
> FACE--the physical obstruction and destruction of reproductive
> health clinics and the intentional interference and intimidation of
> persons obtaining and providing reproductive health services--is
> activity with an effect that is economic in nature. Reproductive
> health clinics are income-generating businesses that employ
> physicians and other staff to provide services and goods to their
> patients. Motivated by anti-abortion sentiment, the primary goal of
> individuals and groups engaged in the misconduct prohibited by
> FACE is to temporarily and permanently interrupt the operations of

15

reproductive health facilities and prevent individuals from accessing their services. *See* S.Rep. No. 103-117, at 11; H.R.Rep. No. 103-306, at 9, U.S.C.C.A.N., at 706. Congress found that the violent and obstructive acts directed at reproductive health facilities had caused millions of dollars of damage and forced clinics to close, caused serious and harmful delays in the provision of medical services and intimidated a number of physicians from offering abortion services. *See* S.Rep. No. 103-117, at 14; H.R.Rep. No. 103-306, at 7, U.S.C.C.A.N., at 704. The effect of the conduct proscribed by FACE is to deter, and in some cases to stop completely, the commercial activity of providing reproductive health services. We thus hold that although the connection to economic or commercial activity plays a central role in whether a law is valid under the Commerce Clause, we hold that economic activity can be understood in broad terms. Pursuant to this principle, unlike the activity prohibited by VAWA, the misconduct regulated by FACE, although not motivated by commercial concerns, has an effect which is, at its essence, economic. *See* Weslin, 156 F.3d at 296 (threats of violence that have the effect of deterring commercial activity is properly regulated under commerce clause); Hoffman, 126 F.3d at 587 (activity regulated by FACE, while not itself economic or commercial, "is closely and directly connected with an economic activity ... therefore ... we cannot conclude that FACE has nothing to do with commerce or any sort of economic enterprise"); Dinwiddie, 76 F.3d at 921 ("FACE prohibits interference with a commercial activity--the provision and receipt of reproductive health services."); Cheffer, 55 F.3d at 1520 ("the Access Act does regulate commercial activity, the provision of reproductive health services.").

Gregg, 226 F.3d at 262 -263.

In Norton v. Ashcroft, 298 F.3d. 547, 556 (3d. Cir.2002), *cert. denied*, 537 U.S. 1172

(2003), another post-Morrison case, the Sixth Circuit also held that the FACE Act was a

permissible exercise of Congress' power under the commerce clause.  Initially, the Sixth Circuit

rejected the notion that Morrison somehow changed the commerce clause landscape requiring

reconsideration of previous cases discussing the constitutionality of the FACE Act.  The Court in

Norton stated:

> In particular, plaintiffs contend that Morrison calls into question
> the uniform body of pre-Morrison caselaw upholding the Act, and

that the Act does not pass muster under <u>Morrison's</u> four-factor test. At the outset, we reject plaintiffs' initial contention that <u>Morrison</u> calls into question the uniform body of cases upholding the Act against Commerce Clause challenges. Rather than breaking new Commerce Clause ground, <u>Morrison</u> derived its four-factor framework directly from <u>Lopez</u>. <u>Morrison</u>, 529 U.S. at 609 ("Since <u>Lopez</u> most recently canvassed and clarified our case law governing this third category of Commerce Clause regulation, it provides the proper framework for conducting the required analysis of [the civil remedy provision of the Violence Against Women Act]."); *see also* <u>United States v. Faasse</u>, 265 F.3d 475, 481 (6th Cir.2001)*,* 265 F.3d at 482 (characterizing <u>Morrison</u> as elaborating upon *Lopez* ); <u>United States v. Corp</u>, 236 F.3d 325, 331-33 (6th Cir.2001) (applying four-part <u>Lopez</u> test in light of <u>Morrison</u>).

<u>Norton</u>, 298 F.3d. at 556.

This Court agrees that <u>Morrison</u> is an elaboration of <u>Lopez</u>, not a change in the standard regarding the test for determining whether a statute effects interstate commerce.  The Sixth Circuit further held in <u>Norton</u> that even under the standard as elaborated in <u>Morrison</u>, the FACE Act was properly within the commerce clause:

We are also satisfied that the Act withstands scrutiny under <u>Morrison</u>. In particular, we find the Third Circuit's application of the <u>Lopez/Morrison</u> four-factor test and its examination of the Act's extensive congressional findings persuasive. *See* <u>Gregg</u>, 226 F.3d at 261-67. Initially, we find that the Act, unlike the Violence Against Women Act's civil remedy provision, regulates activity-- "the physical obstruction and destruction of reproductive health clinics and the intentional interference and intimidation of persons obtaining and providing reproductive health services" --that has a direct economic effect. <u>Id.</u> at 262. Express congressional findings underlying the Act plainly demonstrate that violent and obstructive acts directed at reproductive health facilities resulted in millions of dollars in damage, forced reproductive health clinics to close, delayed medical services, and intimidated numerous physicians from offering abortion services. S.Rep. No. 103-117, at 14 (1993); H.R.Rep. No. 101- 306, at 7 (1993), *reprinted in* 1994 U.S.C.C.A.N, 699, 704. While the activity prohibited by the Act might be motivated by non-commercial sentiment--namely, staunch moral opposition to abortion--the effect of this activity is unambiguously and directly economic. Thus, in our view, such

conduct is properly considered commercial activity.

Norton,  298 F.3d at 556.

As noted above, other than the fact that it predated Morrison, the defendant has not articulated any reason to find that Weslin no longer remains valid law in this Circuit.  The Northern District of New York continued to rely on Weslin in a post-Morrison case,  People of State of New York ex rel. Spitzer v. Kraeger, 160 F.Supp.2d 360, 374 (N.D.N.Y. 2001), where the Court held that the FACE Act is both a constitutional exercise of the Commerce Clause and content-neutral regulation because it "prohibits obstruction of reproductive health clinics regardless of the issue that animates the demonstrators. Kraeger, 160 F.Supp.2d at 374.

Rather than follow the Second Circuit's decision in Weslin, or the post-Morrison decisions of Gregg and Norton, the defendant argues that the Court should follow the District Court decision in United States v. Bird, 279 F.Supp. 2d 827 (S.D.Tex. 2003) ("Bird II").  In Bird II, the District Court rejected the Congressional findings as to the effects of the FACE Act on interstate commerce and made its own finding that the fact that a person may travel across state lines to an abortion clinic has "at most an insubstantial or attenuated affect on interstate commerce." Bird II, 279 F.Supp. 2d 836.  Thus, the Court in Bird II concludes that the Fifth Circuit in Bird I, as well as the Courts in Gregg and Norton, erred in finding that an aggregation of the proscribed activity under the FACE Act was necessary and proper in finding that the statute effected interstate commerce.  Bird II, 279 F.Supp. 2d 834-835.  The Court in Bird II also concludes that the conduct of "Bird and other anti-abortionists has had a "positive" impact on interstate commerce, albeit unintended." Bird II, 279 F.Supp. 2d at 835.  The source information upon which the Court makes these factual findings is not apparent in the Court's opinion. This Court is not persuaded to follow Bird II.  The Court notes that Bird I, which

18

expressly finds the FACE Act constitutional, remains valid in the Fifth Circuit.

Although the judicial branch is the final arbiter of the constitutionality of a statute, courts review a congressional determination that it had the power to enact a particular piece of legislation with substantial deference. Gregg, 226 F.3d. at 261 (citations omitted).  It is impermissible for this Court to "second-guess the legislative judgment of Congress" that blockades and violence directed at reproductive health clinics can be regulated under the Commerce Clause power.  This Court may only inquire into whether Congress had a rational basis for that conclusion. Gregg,  226 F.3d at 262. The Court may only invalidate a congressional enactment passed pursuant to the commerce clause if it bears no rational relation to interstate commerce. United States v. Faasse, 265 F.3d 475, 481 (6th Cir.2001).  The Court is not free to replace Congress' factual findings with its own. As discussed above, Congress has identified a rational basis relating to find that the conduct proscribed by the FACE Act effects interstate commerce.

Citing Bird I, the Third Circuit also addressed the jurisdictional requirement under Morrison. The Court held:

> A jurisdictional element ... refers to a provision in a federal statute that requires the government to establish specific facts justifying the exercise of federal jurisdiction in connection with any individual application of the statute." ... FACE does not contain an explicit jurisdictional element establishing that the federal cause of action is in pursuance of Congress's power to regulate interstate commerce. Although such an element would certainly lend support to the conclusion that FACE is tied to interstate commerce, we conclude that it was not necessary for Congress explicitly to limit the civil remedy provision in the case of regulating anti-abortion activity directed at reproductive health clinics that are, by definition, directly engaged in the business of providing reproductive health services. See Bird I, 124 F.3d at 675 (reasoning that a jurisdictional element is "not *always* a necessary" method to ensure that Congress does not exceed its commerce power).

<u>Gregg</u>,  226 F.3d at 263.

The Court finds the reasoning of <u>Weslin</u>, <u>Gregg</u> and <u>Norton</u> to be sound.  Based on the

above, it is recommended that the defendant's motion to find the FACE Act unconstitutional

should be denied.


**Statements Made to the Media**

The defendant seeks to suppress certain statements he made on November 12, 2002 to

various members of the media, including the Buffalo News.  The statements at issue include

those in which Kopp reportedly acknowledged that he shot Dr. Slepian using the rifle found by

the government and that he did so to stop Dr. Slepian from providing abortion services.  The sole

argument asserted in support of this motion is that Kopp made the statements in response to

"promises" by the government that it would move for the immediate release of Loretta Marra.

The government acknowledges that, with the consent of Paul Cambria, Esq., Kopp's counsel in

this matter at the time, the government did have some discussions with Bruce Barket, Esq.,

Kopp's attorney in the state court prosecution.   An affidavit submitted by Barket, states that the

discussions between himself and the federal prosecutors were in the nature of plea negotiations

–apparently on behalf of Marra– wherein Barket advised the government that Marra might be

able to get Kopp to make an admission. Barket stated that Kopp had decided to make an

admission in any event, but that Marra might be able to persuade him to make the admission

"sooner rather than later." (See Barket Affidavit, ¶ 19 attached as Exhibit V-3 to Docket No.

129).  In exchange, Marra was to receive leniency in the form of a downward departure from the

sentencing guidelines.[7]  Barket acknowledges that no specific promises were made and that no

final agreement was reached at the time Kopp met with the Buffalo News reporters, with Barket

present, to make his statement. (See Barket Affidavit, ¶ 20-21 attached as Exhibit V-3 to Docket

No. 129).

The defendant has failed to establish a factual issue requiring a hearing.  The has been no

articulation of facts from which the Court could conclude that Kopp's statements to the Buffalo

News reporters were unknowingly or involuntarily made.  The defendant presents no authority

whatsoever in support of this request to suppress statements voluntarily made to members of the

media.  Kopp has failed to articulate how the Fifth Amendment is applicable with respect to the

statements made in this case. A defendant's Fifth Amendment rights are generally not implicated

with respect to incriminating statements made to private persons in the absence of police

subterfuge or intimidation.  The record is devoid of any evidence of police subterfuge or

intimidation in this case.  Kopp asserts that the arrangements for his statement to the media were

made by the government and that his statement was made as a direct result of promises made by

the government.  It appears that this is disputed.  However, the Second Circuit has held that the

presence of a direct or implied promise of help or leniency alone does not bar the admission of a

confession where the totality of the circumstances indicates it was the product of a free and

independent decision. United States v. Guarno, 819 F.2d. 28, 30 (2d. Cir. 1987).  In the instant

case, as reflected in the Barket's Affidavit, several factors led Kopp to determine that he would

make incriminating statements to the media. The fact that Kopp may have been partially

motivated by a desire to secure beneficial treatment for Marra, notwithstanding the absence of

---

[7]     As discussed above, a plea agreement between the government and Marra was
eventually reached, but rejected by the District Court in the Western District of New York.  The
charges against Marra were eventually disposed of in the Eastern District of New York.

any final agreement to such, does not render the statements involuntary.

Kopp also asserts that these statements should be suppressed because he was represented by conflicted counsel at the time the statements were made.  This Court held that Barket could not represent Kopp in the federal court prosecution because of a conflict arising out of Barket's representation of Marra.  As noted above, Barket did not represent Kopp in this case.  At the time Kopp made the incriminating statements he was represented in this action by Paul Cambria, Esq. Thus, at that time, Kopp had a competent, conflict-free attorney to advise him with respect to whether he should or should not make any statements.  The record in this case does not include the extent of any discussions between Kopp and Cambria on this issue (which would be subject to the attorney-client privilege). It may be that Kopp did not take advantage of the fact that he was represented by competent, conflict-free counsel.  This fact would not render involuntary Kopp's otherwise voluntary statements to the media. Moreover, the Court notes that Kopp repeatedly attempted to waive any conflict which might impede Barket from representing him in this matter.  The Court notes that on October 22, 2002, prior to making the statements at issue, this Court had commenced a hearing under United States v. Curcio, 680 F.2d. 881 (2d Cir. 1982), wherein Kopp was advised of any potential conflicts resulting from Barket's representation of both himself and Marra.  Between October 22, 2002 and October 31, 2002, Kopp met with an independent counsel assigned by the Court to further discuss and explain the potential conflict issues to Kopp. To make certain that Kopp had sufficient time to consider all aspects of the counsel issue, the Court continued the Curcio hearing to November 12, 2002, at which time Kopp again advised the Court that he continued to waive any possible conflict regarding Barket's representation. The fact that this Court ultimately determined that Barket could not represent Kopp in this federal court action does not render Kopp's statements

involuntary.  It is worth repeating, at all times in this case Kopp was represented by competent,

conflict-free counsel.  The fact that Kopp consulted persons other than, or in addition to, his

attorney, Paul Cambria, and decided to make incriminating statements to the media on November

12, 2002 does not warrant a finding that Kopp was denied adequate assistance of counsel at that

time.

The defendant's motion to suppress the statements made on November 12, 2002 should

be denied.


**Admissibility of Expert Testimony**

The defendant seeks, by way of a motion *in limine*, to restrict the use of expert testimony

by the government in this case.  Both the defendant and the government represent that this issue

is better determined by the District Court presiding over the trial in this case.  This Court agrees.


**Identification**

Kopp also seeks to suppress identifications of several witnesses.  At a hearing regarding

the identification procedures utilized in this case, the government represented that it intended to

use three witnesses who would testify that they saw Kopp in the vicinity of Dr. Slepian's

neighborhood near the date of the shooting: Daniel Lenard, Mary Jo Brummer and Dolah Barrett.

All three testified as to the circumstances in which they saw the defendant in the neighborhood,

and as to their contact with the various law enforcement officers in connection with making the

identification.  In addition, various officers testified as to the procedures utilized in the

identification process.

The record includes copies of the photo arrays used in connection with the three identifications.  The defendant does not assert that any of the photo arrays were impermissibly suggestive in any way.  Further, the defendant does not challenge any specific conduct on the part of any law enforcement agent as being impermissibly suggestive, thus tainting the identifications.  Instead, the defendant presents two arguments: (1) that the identifications were each tainted by the fact that law enforcement officials had previously released a photo of Kopp to the media;  and (2) that the testimony of each of the purported witnesses was incredible. (Docket No. 143).

Identification evidence is generally to be weighed by the jury.  "Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature."  Manson v. Brathwaite, 432 U.S. 98, 116 (1977).  A  prior identification is generally admissible. United States v. Owens, 484 U.S. 554, 562-63 (1988). The Court will exclude a pre-trial identification only if the procedure that produced the identification is "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." Stovall v. Denno, 388 U.S. 293, 302 (1967); Simmons v. United States, 390 U.S. 377, 384 (1968); United States v. Maldonado-Rivera, 922 F.2d 934, 973 (2d Cir.1990), cert. denied, 501 U.S. 1233 (1991).  It is well settled in the Second Circuit that a pre-trial identification is to be excluded only if it was both produced through an unnecessarily suggestive procedure and unreliable. United States v. Simmons, 923 F.2d 934, 950 (2d Cir. 1991).  Thus, even if the procedure was unnecessarily (or impermissibly) suggestive, the Court may still admit the evidence "if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability." Simmons, 923 F.2d at 950; Manson v. Brathwaite, 432 U.S. 98, 114 (1977) ("reliability is the linchpin in determining the admissibility of identification

testimony").

The defendant does not assert any specific factual claim to support an inference that the conduct of the law enforcement officials in this case was impermissibly suggestive.  Here, the defendant asserts that the mere release of his photo to the media invalidated any subsequent identification by a person who saw his picture in the media. The defendant has presented no authority holding that the release of a photo of an individual wanted in connection with a crime invalidates any subsequent identification from a witness who saw the photo in the media.  To the contrary, it has been held that it is permissible for law enforcement officials to release the photograph of individuals wanted for questioning and that such a release does not automatically invalidate subsequent identifications.  United States v. Milano, 443 F.2d 1022, 1026 (10th Cir. 1971)(we hesitate to discourage law enforcement agencies from releasing pictures of wanted suspects to the press in order to obtain the public's help in apprehending them); United States  v. Boston,  508 F.2d 1171, 1177 (2d Cir. 1974)(the use of the photograph that had been published in a newspaper story did not invalidate photo array or identification).

In this case, after seeing Kopp's picture in the media, each of the purported witnesses contacted the police and stated that they saw the defendant in the neighborhood near Dr. Slepian's home prior to the shooting. There has been no allegation of any suggestive conduct on the part of the law enforcement agents involved.  Each witness provided testimony as to the circumstances under which they observed Kopp, and why the encounter made a sufficient impression upon them to make the subsequent identification.  The Court finds that the testimony of each identification witness, when viewed in consideration of the totality of the circumstances, was sufficiently reliable so that the identifications may be presented to the finder of fact in this case.

In light of the above, the motion to suppress the identifications should be denied.

**Suppression of Electronic Warrants**

Inasmuch as the government has disclosed an intention to use any intercepted communications of the defendant, the defendant merely presented this claim to reserve his right to move to suppress any such communications should the government notify the defense of an intention to use such evidence. This motion was withdrawn in Court by defendant's counsel.

## Conclusion

It is recommended that the various motions to dismiss the indictment or suppress evidence by denied.

Pursuant to 28 USC §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten(10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as WDNY Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME,  OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir.

1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil

Procedure, and WDNY Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to

consider arguments, case law and/or evidentiary material which could have been, but was not,

presented to the Magistrate Judge in the first instance.  See Patterson-Leitch Co. Inc. v.

Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to WDNY Local Rule 72.3(a)(3), "written

objections shall specifically identify the portions of the proposed findings and recommendations

to which objection is made and the basis for such objection and shall be supported by legal

authority."  **Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District**

**Court's refusal to consider the objection.**

So ordered.

s/Hon. Hugh B. Scott

United States Magistrate Judge

Buffalo, New York

April 11, 2005